Robert JONES and Almarie
Jones Plaintiffs,

v.

AMAZING PRODUCTS,
INC. Defendant.

No. CIV.A.1:00–CV–1678–JEC.

United States District Court,
N.D. Georgia,
Atlanta Division.

March 19, 2002.

**1232**

Phillip Edward Friduss, Hall Booth Smith & Slover, Atlanta, GA, for Plaintiff.

Stephen L. Goldner, Goldner Sommers Scrudder & Bass, Atlanta, GA, for Defendant.

### ORDER

CARNES, District Judge.

This case is presently before the Court on defendant's Motion for Summary Judgment [23–1] and plaintiffs' Motion for Reconsideration of the Court's Order dated November 6, 2001 [34–4]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that defendant's Motion for Summary Judgment [23–1] should be **GRANTED in part and DENIED in part** and plaintiffs' Motion for Reconsideration of the Court's Order dated November 6, 2001 [34–4] should be **DENIED.**

### FACTUAL BACKGROUND

This is a product liability action. Plaintiff Robert Jones ("Mr. Jones") and his wife Almarie Jones ("Mrs. Jones") (collec-

tively "plaintiffs") filed suit alleging that a drain line clearer called "Liquid Fire" was defectively designed, manufactured, and marketed by defendant Amazing Products, Inc. ("Amazing Products" or "defendant"). Specifically, plaintiffs allege that Liquid Fire is unreasonably dangerous, improperly packaged, and accompanied with inadequate instructions under strict liability, negligence and gross negligence theories. Mr. Jones was severely injured when the product spilled on him.

Currently before the Court is defendant's Motion for Summary Judgment [23] and plaintiffs' Motion for Reconsideration of the Court's Order dated October 6, 2000 [34–4]. Unless otherwise indicated, the Court draws the undisputed facts that underlie the allegations in the Complaint from "Defendant's Statement of Undisputed Material Facts" ("SMF") [23]. If, however, plaintiffs have disputed a specific fact and pointed to evidence in the record supporting its version of events, the Court has viewed all evidence and factual inferences in the light most favorable to plaintiffs, as required on a defendant's motion for summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *McCabe v. Sharrett*, 12 F.3d 1558, 1560 (11th Cir.1994); *Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 469 (11th Cir.1993). Accordingly, the following facts are either not disputed or are viewed in the light most favorable to the plaintiffs.

On or about June 11, 1999, Mr. Jones purchased a container of Liquid Fire from an Ace Hardware store in Adel, Georgia in order to unclog his bathroom sink and bathtub drains. (R. Jones Dep. at 19–21.) He selected Liquid Fire based on the recommendation of his cousin, a licensed plumber. (SMF ¶ 1.)[1] Mr. Jones specifi-

---

1. Defendant contends that it does not advertise its "Liquid Fire" product or participate in

any other marketing effort. (SMF ¶ 12.) Plaintiffs, however, dispute this claim arguing

cally requested from a store clerk a container of Liquid Fire. (R. Jones Dep. at 21.) The store clerk retrieved a pint-sized container from the shelf and presented it to Mr. Jones. (*Id.* at 22.) Mr. Jones testified that the clerk told him that it was the only size of the product that the store had in stock. Defendant sells Liquid Fire in pint and quart size containers without handles, and one-gallon containers with handles. (SMF ¶ 7.)[2] Mr. Jones purchased the product and left the store.

On June 14, 1999, approximately three days later, Mr. Jones decided to use the Liquid Fire he purchased to unclog his bathroom sink and bathtub drains. (R. Jones Dep. at 23.) Prior to using the product, Mr. Jones states that he sat down to read the warning/instruction label affixed to the container of Liquid Fire. (*Id.* at 22.) Despite the fact he was able to read, Mr. Jones only read selective portions of the warning/instruction label, however. (SMF ¶ 2.) A 64 year-old retiree, Mr. Jones states that the reason he failed to read the entire label was because the typeface was too small for him to read, even while wearing his reading glasses. (Pls.' Resp. to Def.'s Stmt. of Mat. Facts [35] ("PSMF") ¶ 2.) Plaintiff did "read enough to know that [he] was scared" of the product and that the product was potentially dangerous. (R. Jones Dep. at 35.) He did not, however, ask someone else to read the warning/instruction label to him before using the product. (*Id.*) Despite having read only a sufficient amount of the warning/instruction label to understand he was dealing with a dangerous product, Mr. Jones elected to use the product. Mr.

Jones states that he proceeded to use the product at that time because he was scheduled to leave on his honeymoon soon thereafter and wanted to leave the Liquid Fire in the drains while they were away on vacation. (R. Jones Dep. at 21–22.)

The label attached to the product indicates that it contains "concentrated sulfuric acid."[3] (PSMF ¶ 4.) The label specifically warns the consumer to read the label before using the product. (*See* Warning/Instruction Label attached as Ex. A to Def.'s Br. In Supp. Of Mot. For Summ. J. [23] (hereinafter "Warning Label.").) It further warns the consumer to "never transfer to another container." (PSMF ¶ 5.) In addition, the label includes the warning to "never add water to LIQUID FIRE while in bottle because of violent reaction." (*Id.*)

In preparation for use of the Liquid Fire solution, Mr. Jones decided to transfer the product into a gallon sized plastic container with a handle that formerly held Clorox bleach. (*Id.* at 32, 35.) He chose to transfer the product into the Clorox container because it had a handle. (*Id.*) Because the product was dangerous, he was concerned that he would not be able to properly hold the Liquid Fire container without the help of a handle, due to a shoulder condition that hindered his ability to grip and hold items. (*Id.* at 32.) The plaintiff had previously been using the empty Clorox bottle to water his plants. (*Id.* at 29.) Before transferring the product to the Clorox container, he held the container upside down to ensure no water was inside. (*Id.* at 40.) As he sat on the back steps of his

---

that the act of selling to, and maintaining relationships with, distributors and other purchasers constitutes marketing.

**2.** Since the 1980's, Amazing Products has manufactured the Liquid Fire bottles, but has made no changes in the container design. ((J. Duffy Dep. at 15–16.)

**3.** Mr. Jones was not aware that the product contained concentrated sulfuric acid. If he had been aware that the product contained concentrated sulfuric acid, he claims that he would never have used "Liquid Fire." (SMF ¶ 3.)

house, Mr. Jones used a black plastic funnel to pour the entire Liquid Fire contents into the Clorox container. (*Id.* at 29.)

After transferring the "Liquid Fire" into the empty Clorox bottle, plaintiff immediately walked, with the Clorox bottle in hand, through his house towards the bathroom to use the product. (*Id.* at 43.) As he walked through the kitchen, he heard a "whoofh" noise, and the bottom fell out of the container. (*Id.* at 43.) The entire quart of concentrated sulfuric acid poured all over Mr. Jones' right leg and foot. (*Id.* at 44, 45.) He cried out in pain, and his wife came to him and assisted him to the back yard, where she sprayed him down with a water hose. (*Id.* at 46.) Mrs. Jones then took Mr. Jones to the hospital. (*Id.* at 45.)

Mr. Jones suffered deep chemical burns. (*Id.* at 56.) His burns necessitated that he stay at various hospitals, including the South Georgia Medical Center, where a skin graft was performed, Memorial Hospital of Adel and Phoebe Putney Memorial Hospital. (*Id.* at 56–58.) In addition, he was treated by the Wound Care Center and Plastic Surgery Associates. (*Id.*)

Mr. Jones' right foot is disfigured, and he continues to have pain related to the acid burns. (*Id.* at 61.) He has deep gashes in his leg and foot, and states that he cannot wear sandals or shorts anymore. (*Id.*) He notes that the injured leg is very tender and limits his ability to walk. (*Id.* at 62.)

On June 12, 2000, plaintiffs filed suit in the Superior Court of Fulton Country, Georgia. Subsequently, on July 5, 2000, defendant removed this case to the United States District Court for the Northern District of Georgia, Atlanta Division. Plaintiffs are both Georgia residents and defendant is a Kentucky corporation licensed to conduct business in the State of Georgia. Plaintiffs seek damages in excess of $75,000. (Notice of Removal [1]

¶ 4.) Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1332.

## DISCUSSION

### I. Standard for Summary Judgment Motion

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." " FED. R. CIV. P. 56(c). A fact's materiality is determined by the controlling substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* at 249–50, 106 S.Ct. 2505.

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of every element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. *Id.* at 322–23, 106 S.Ct. 2548 (quoting FED. R. CIV. P. 56(c)).

The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323, 106 S.Ct. 2548. However, the movant is not required to negate his oppo-

nent's claim. The movant may discharge his burden by merely " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. 2548. After the movant has carried his burden, the non-moving party is then required to "go beyond the pleading" and present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548. While the court is to view all evidence and factual inferences in a light most favorable to the non-moving party, *Samples v. City of Atlanta,* 846 F.2d 1328, 1330 (11th Cir.1988), "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505 (1986).

## II. Legal Standards for Claims in This Complaint: Distinctions between Strict Liability Claim and Negligence Claims

Plaintiffs' Complaint [1] alleges three claims [4] of liability that are before this Court on the present motion for summary judgment.[5] (Am. Compl. [7] ¶¶ 7–20.) In Count One, plaintiffs allege that defendant is strictly liable to plaintiff for placing into the stream of commerce a product that was unreasonably dangerous because of design, manufacturing, and marketing defects. (*Id.* ¶¶ 7–9.) The gist of this claim is that defendant is strictly liable because it manufactured a product that was unreasonably dangerous, regardless of whether the design of the container or the express warnings found on the container were adequate. In effect, this part of the claim alleges that Liquid Fire should not be on the market and that defendant is strictly liable for allowing the product to be sold to the general public. This strict liability count also contends that, even if its product were lawfully on the market, the defendant improperly designed the container and failed to include, or "bundle," necessary safety equipment with the product. Finally, as the last component of its strict liability claim, plaintiff contends that, as marketed, Liquid Fire contained inadequate labeling that failed to detail the dangers that could occur from the use of the product.

In Count Two, plaintiffs allege that defendant was negligent in the design, manufacturing, and marketing of its product. (*Id.* ¶¶ 10–14.) In Count Three, plaintiffs allege that defendant's conduct amounted to gross negligence as it demonstrated an entire want of care and a conscious indifference to the safety of Mr. Jones. (*Id.* ¶¶ 15–16.) These negligence claims echo the same contentions that inhere in the strict liability claims: that Liquid Fire was unreasonably dangerous, that its container was improperly designed and the product should have included necessary safety equipment, and that the product was inadequately labeled.

---

**4.** Plaintiffs had originally alleged a fourth claim, which alleged that the defendant breached the express and implied warranties that the Liquid Fire product and its container were fit for the purposes for which they were intended. (Am. Compl. [7] ¶ 18.) In response to defendant's Motion for Summary Judgment, plaintiffs have voluntarily dismissed their breach of warranty claims. (Pls.' Resp. to Def.'s Mot. for Summ. J. [35] at 20.) Accordingly, the Court DISMISSES plaintiffs' breach of warranty claims.

**5.** The fifth count of Plaintiffs' Amended Complaint [7] alleges loss of consortium, which is only compensable upon a finding of fault in the underlying claims, and therefore is not before the Court at this time. Accordingly, when the Court uses the singular term, "plaintiff," it is referring to the victim of the accident, plaintiff Robert Jones.

In short, plaintiffs have taken the same core facts and derived two legal claims out of these facts: strict liability and negligence. Indeed, for the most part, the parties collapse the two terms and construe the legal theories as being interchangeable.[6] The Court will largely follow this same approach in resolving the motion for summary judgment. Before doing so, however, the Court will set out the elements of each type of claim.

## A. *Strict Liability Claims*

██ In order to establish a claim based on strict liability, plaintiffs are required to demonstrate that, when sold, defendant's product was "not merchantable and reasonably suited to the use intended, and its condition when sold [was] the proximate cause of the injury sustained." O.C.G.A. § 51–1–11. A plaintiff can state a claim based on strict liability by showing that the product at issue was "not merchantable" due to one of three types of product defects: manufacturing defects, design defects, and marketing/packaging defects. *See Banks v. ICI Americas, Inc.*, 264 Ga. 732, 450 S.E.2d 671 (1994). Plaintiffs appear to allege that Liquid Fire is defective in all three regards. (*See* Amended Compl. [7] ¶ 5.)

██ A manufacturing defect is a defect that is "measurable against a built-in objective standard or norm of proper manufacture." *Banks*, 264 Ga. at 734 n. 2, 450 S.E.2d at 673 n. 2. In manufacturing defect cases, "it is assumed that the design of the product is safe and had the product been manufactured in accordance with the design it would have been safe for consumer use."[7] *Id.* at 733, 450 S.E.2d at 673. Thus, by definition, a manufacturing defect will always be identifiable as a deviation from some objective standard or a departure from the manufacturer's specifications established for the creation of the product. With regard to a claim of manufacturing defect, no showing of negligence would be necessary; instead, the deviation, accompanied by evidence that this deviation was the proximate cause of the injury, would satisfy the elements of the claim.

██ While a "manufacturing defect" is a fairly straightforward concept, a "design defect" is a far more diffuse proposition under Georgia Supreme Court precedent, as the latter calls for the finder of fact to employ a loose balancing test to determine whether the manufacturer properly designed the product. Specifically, in *Banks v. ICI Americas, Inc.*, 264 Ga. 732, 450 S.E.2d 671 (1994), the Georgia Supreme Court promulgated a "risk-utility analysis, "whereby the risks inherent in a product are weighed against the utility or

---

6. In recognition of the similarity between a strict liability and negligence action under Georgia law, plaintiffs "incorporate by reference all the arguments set forth in the section of [the] brief based on strict liability." (Pls.' Br. In Opp. To Def.'s Mot. For Summ. J. [35] at 17.) Defendant also acknowledges that the negligence standard mirrors the strict liability standard. (Def.'s Br. In Supp. Of Mot. For Summ. J. [23] at 21–22.) Because of the inherent similarity between a negligence and a strict liability action under Georgia law, the analysis of plaintiffs' strict liability claims largely applies to an examination of the negligence claim.

7. In contrast, "[i]t is only in design defect cases that the court is called upon to supply the standard for defectiveness: the term 'defect' in design defect cases is an expression of the legal conclusion to be reached, rather than a test for reaching that conclusion." *Banks*, 264 Ga. 732, 734, 450 S.E.2d 671, 673 (citing to WADE, ON PRODUCT DESIGN DEFECTS AND THEIR ACTIONABILITY, 33 Vand.L.Rev. 551, 552 (1980); 2 AMERICAN LAW OF PRODUCTS LIABILITY 3D (1987), § 28:1.) In manufacturing defect cases, however, the standard of comparison is supplied by the designer of the perfectly executed product that is in complete accordance with the intended design.

benefit derived from the product." The court explained that:

[t]his risk-utility analysis incorporates the concept of 'reasonableness,' i.e., whether the manufacturer acted reasonably in choosing a particular product design, given the probability and seriousness of the risk posed by the design, the usefulness of the product in that condition, and the burden on the manufacturer to take the necessary steps to eliminate the risk. When a jury decides that the risk of harm outweighs the utility of a particular design (that the product is not as safe as it should be), it is saying that in choosing the particular design and cost trade-offs, the manufacturer exposed the consumer to greater risk of danger than he should have.

*Id.* at 734, 450 S.E.2d at 673. There is no objective test in a design defect claim; instead, the jury considers the costs of a certain enhanced design against the benefits that the design might produce and then, substituting its business judgment for that of the manufacturer, indicates, through its verdict, whether it would have made the same business decision. As the jury is given no guideline as to when a given cost might prove to be too much or when a given benefit might be deemed too cost-inefficient to warrant the use of the alternative design, its decision is necessarily quite subjective. Further, a "risk-utility" analysis, with its requirement of evaluating the "reasonableness" of the manufacturer's decision, much more closely mimics a negligence analysis [8] than a "pure" strict liability test, as the original meaning of the latter term implied an automatic liability, even without any negligence, when certain other prerequisites were shown.

■ Finally, the third species of defect—a marketing/packaging defect—does not appear to carry its own set of criteria, but instead appears to be a sub-set of a manufacturing defect or a design defect, depending on the particular facts. Thus, if a container is faulty because it deviates from the manufacturer's specifications for a container or if a particular label is inadequate because it omits a line that is contained in the company's prototypical label,

---

8. In fact, the risk-utility analysis employed in design defect cases is a much more loosely defined "standard" than is a traditional negligence test. In a traditional negligence case, the finder of fact determines what a "reasonable" person would do in a particular situation. While there may be differences of opinion as to whether a defendant exercised reasonable care in the given situation, the finder of fact and reviewing court are both seeking to identify a single standard of reasonableness. With a risk-utility analysis, however, there is no single standard of reasonableness that the finder is attempting to identify. Instead, there are two competing standards of reasonableness. The first standard of reasonableness is an economic standard by which a manufacturer attempts to reduce costs and maximize profits. The second standard of reasonableness requires the manufacturer to attempt to design a product that will result in no accidents, an effort that will often increase costs and reduce profits. Adding to the complexity of this endeavor for the manufacturer is the existence of competitors who may not be as cautious in their design decisions, meaning that the manufacturer who leans toward assuring the most beneficial design, no matter the cost, will also have to factor in the loss of business that it will suffer as a result of taking a more cautious approach. Logically, a jury will also have to consider these competitive pressures in applying the risk-utility analysis.

Because the risk-utility analysis adopts no meaningful standard by which a jury can make its balancing decision, the jury is effectively free to choose whatever result it wishes, without any real ability for a reviewing court to examine that decision and to determine whether, as a matter of law, it is a sustainable decision. Accordingly, while the Georgia courts have treated the risk-utility analysis as synonymous with a negligence inquiry, the former actually imposes a different, more difficult, and less reviewable inquiry than does the latter.

these flaws would be manufacturing defects. If a container, however, is deemed faulty because the jury disagrees with the manufacture's decision as to its design, the container would represent a design defect. Similarly, if a jury deems a warning label inadequate because it did not fully or clearly enough communicate the dangers of the product and the precautions to be taken in its use, then this flaw would likewise be more akin to a design defect.

### B. *Negligence Claims*

██ Count Two of plaintiffs' Amended Complaint [7] sets forth a negligence claim against defendant, contending that defendant was negligent in the design, manufacture, and marketing of Liquid Fire. The Amended Complaint [7] further contends that defendant knew, or in the exercise of ordinary care, should have known, that the product and its container were defective and unreasonably dangerous to its likely consumers. Under Georgia law, to recover for negligence, a plaintiff must show "(1) a legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risk of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and (4) some loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty." *Bradley Ctr., Inc. v. Wessner,* 250 Ga. 199, 200, 296 S.E.2d 693, 695 (1982).

As noted, Georgia case law has typically assumed that a strict liability "design defect" claim" carries the same elements as a negligence claim aimed at the same alleged shortcomings in the product. "In the subject product-design case, only semantics distinguishes the cause of action for negligence and a cause of action pursuant to O.C.G.A. § 51–1–11 [claiming strict liability for defective design]." *Coast Catamaran Corp. v. Mann,* 171 Ga.App. 844, 848, 321 S.E.2d 353, *aff'd* 254 Ga. 201, 202, 326

S.E.2d 436 (1985); *see also Orkin Exterminating Co. v. Dawn Food Prod.,* 186 Ga.App. 201, 202, 366 S.E.2d 792 (1988) (stating that determination of whether a manufacturer is strictly liable for a defectively designed product requires an evaluation based on the negligence principles of the reasonableness of a manufacturer's design decisions.) In both causes of action, the manufacturer's conduct is judged by the traditional duty of reasonable care. *Coast Catamaran,* 171 Ga.App. at 848, 321 S.E.2d 353; *Honda Motor Co., Ltd. v. Kimbrel,* 189 Ga.App. 414, 418, 376 S.E.2d 379 (1988); *Hunt v. Harley–Davidson Motor Co.,* 147 Ga.App. 44, 248 S.E.2d 15 (1978); *Weatherby v. Honda Motor Co., Ltd.,* 195 Ga.App. 169, 171, 393 S.E.2d 64 (1990); *Vax v. Albany Lawn & Garden Ctr.,* 209 Ga.App. 371, 433 S.E.2d 364 (1993). Indeed, as noted *supra,* in apparent recognition of the similarity between a strict liability and negligence action under Georgia law, plaintiffs have "incorporate[d] by reference all the arguments set forth in the section of [the] brief based on strict liability." (Pls.' Br. In Opp. To Def.'s Mot. For Summ. J. [35] at 17.) Defendant also acknowledges that the negligence standard mirrors the strict liability standard. (Def.'s Br. In Supp. Of Mot. For Summ. J. [23] at 21–22.)

This Court will deal with the overlap in legal concepts by first addressing that part of plaintiff's strict liability claim that alleges a manufacturing defect. Second, the Court will address, under both a strict liability theory and a negligence theory, plaintiff's complaint that Liquid Fire was improperly marketed as result of shortcomings in the design of its container and of defendant's failure to "bundle" or attach other safety devices with the product. Third, the Court will address, under both a strict liability theory and a negligence theory, plaintiff's complaint that Liquid Fire's label was inadequate and that it omitted

crucial warnings to the consumer. Finally, the Court will address plaintiff's claim that, regardless of any improvements in the container design or in the warnings provided, Liquid Fire was unreasonably dangerous and should not have been marketed to the public.

Upon analysis of each of these claims, the Court has concluded that defendant is entitled to summary judgment as to plaintiff's claim of manufacturing defects and as to plaintiff's claim that Liquid Fire is unreasonably dangerous, no matter what improvements defendant could conceivably make in its design or in the warnings it provides. The Court concludes, however, that plaintiff has proffered sufficient evidence to create a jury question as to plaintiff's claim that the container was inadequately designed and marketed and his claim that defendant's warnings were insufficient to alert a consumer as to the great potential for danger created by this product.

### III. Manufacturing Defect

■ Plaintiffs have alleged that defendant is strictly liable for manufacturing defects in selling a product that is unreasonably dangerous and that is in a container with an unreasonable risk of spillage and with an insufficient warning included with the package. (Am. Compl. [7] ¶ 7.) Defendant argues that it is entitled to summary judgment as to all claims based on strict liability for manufacturing defects. (Def.'s Br. in Supp. of its Mot. for Summ. J. [23] at 17.) The Court agrees with the defendant that plaintiffs fail to state a claim for strict liability based on manufacturing defects as a matter of law.

A manufacturing defect is a defect that is "measurable against a built-in objective standard or norm of proper manufacture." *Banks*, 264 Ga. at 734 n. 2, 450 S.E.2d at

673 n. 2. In manufacturing defect cases, "it is assumed that the design of the product is safe and had the product been manufactured in accordance with the design it would have been safe for consumer use." [9] *Id.* at 733, 450 S.E.2d at 673. Thus, by definition, a manufacturing defect will always be identifiable as a deviation of some objective standard, the perfect product.

The record is devoid of any evidence demonstrating that the Liquid Fire product purchased by Mr. Jones was improperly manufactured. Specifically, even though plaintiffs allege that defendant's product was unreasonably dangerous, they present no evidence to support the contention that the product had a manufacturing error specific only to the container of Liquid Fire purchased by Mr. Jones. In other words, they present no evidence that Mr. Jones' product was not manufactured in accordance with its design. Furthermore, they present no evidence that indicates that the alleged inadequacy of the warning label was due to a manufacturing error. Simply alleging that a product is dangerous, absent evidence of a deviation from the "perfect" or prototypical bottle of Liquid Fire, is not sufficient to demonstrate the existence of a manufacturing defect. *See Center Chemical Co. v. Parzini*, 234 Ga. 868, 869, 218 S.E.2d 580, 582 (1975). Accordingly, defendant's Motion for Summary Judgment is **GRANTED** as to all strict liability claims based on manufacturing defects.

### IV. ALLEGED DEFECTS IN CONTAINER AND MARKETING OF PRODUCT

#### A. *Defects in Design of Container*

■ Plaintiff contends that the Liquid Fire container is defective in design because it creates an unreasonable risk of spillage and was not coupled with safety

---

**9.** See n. 7, *supra.*

items recommended on the bottle for proper product use. (Am. Compl. [1] ¶ 8.) Specifically, plaintiff identifies the following defects: the absence of a product dispensing system that would prevent acid splash backs from drain openings into one's face, eyes, chest, groin, hands, and legs; the absence of a bottle or jug handle; the use of a squeezable plastic container; and the absence of pre-measured "dose" containers. Plaintiff also contends that defendant should have provided necessary safety equipment, such as chemical splash goggles, a face shield, impervious gloves, and an impervious apron. Plaintiff argues that an expectation that a user will purchase all these necessary safety items creates an unreasonably high "cost of compliance" for the consumer that render it unlikely that consumer will be able to comply with the necessary cautions necessary to follow in using the product. *Id.* at ¶¶ 5–6. Such bundling of the product purportedly increases the likelihood that a consumer will be able to follow all necessary safety precautions and serves to impress on the consumer the inherent dangerousness of the product that he is about to use.

### 1. *Negligence Principles*

The Court will first examine this claim of container defects under negligence principles. As noted, to recover for negligence, a plaintiff must show "(1) a legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risk of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and (4) some loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty." *Bradley Ctr., Inc. v. Wessner,* 250 Ga. 199, 200, 296 S.E.2d 693, 695 (1982).

■■■■ In a products liability case predicated on negligence, the duty im-

posed is the traditional one of reasonable care, and the manufacturer need not provide, from a design standpoint, a product incapable of producing injury. "Generally, if a manufacturer does everything necessary to make the [product] function properly for the purpose for which it is designed, *if the [product] is without any latent defect, and if its functioning creates no danger or peril that is not known to the user,* then the manufacturer has satisfied the law's demands." *Poppell v. Waters,* 126 Ga.App. 385, 387, 190 S.E.2d 815 (1972) (citations and punctuation omitted) (emphasis added); *see also Hunt v. Harley–Davidson Motor Co.,* 147 Ga.App. 44, 46, 248 S.E.2d 15 (stating same). "Actual knowledge by the user of the danger posed by a product is *not* necessary. . . . [in deciding] whether the peril from which an injury results is latent or patent, the decision is made on the basis of an objective view of the product, and whether the subjective perceptions of the user or injured party are irrelevant." (Emphasis in original.) *Weatherby v. Honda Motor Co., Ltd.,* 195 Ga.App. 169, 172, 393 S.E.2d 64 (1990), *overruled on different grounds by Ogletree v. Navistar Int'l Transp. Corp.,* 269 Ga. 443, 500 S.E.2d 570 (1998).

■■■■ The manufacturer is generally not liable for injury resulting from an abnormal use of the product, unless the particular unintended use was foreseeably probable. *Mann v. Coast Catamaran Corp.,* 254 Ga. at 202, 326 S.E.2d 436. However,

> if in the normal functioning of a product as designed such functioning creates a danger or peril that is not [objectively] known to the user or bystander, then the manufacturer is liable for injuries proximately caused by such danger... When the use to which the product was being put at the time of injury is not that originally intended by the manufacturer, the determination of whether ...

[negligence] may be asserted as a viable theory of recovery or whether the manufacturer is insulated from liability because the use of the product was 'abnormal' and intervening depends, initially, upon the foreseeability that the product would be put to that use.

*ICI Americas, Inc. v. Banks*, 211 Ga.App. 523, 525–26, 440 S.E.2d 38, 41–42 (1993) (citations omitted), *rev'd. in part on other grounds*, 264 Ga. 732, 450 S.E.2d 671 (1994).[10] Foreseeability in this context means that which would be foreseeably probable or objectively reasonable to expect, not merely what might occur. *Greenway v. Peabody Intl. Corp.*, 163 Ga. App. 698, 704, 294 S.E.2d 541 (1982); *Ford Motor Co. v. Stubblefield*, 171 Ga.App. 331, 335, 319 S.E.2d 470.

From the foregoing principles it may be inferred that where a product, in its normal functioning, creates a latent danger as designed, arising from a foreseeably probable unintended use, and the user or injured party could not from an objective point of view appreciate the latent danger, the manufacturer may be held liable on a claim of negligent design. *Ford Motor Co.*, 171 Ga.App. at 335, 319 S.E.2d 470; *Poppell*, 126 Ga.App. at 387, 190 S.E.2d 815. In the present case, plaintiff suffered serious injury because the Liquid Fire, which is almost pure sulfuric acid, melted the empty Chlorox bottle to which plaintiff transferred the product, thereby spilling sulfuric acid onto plaintiff's body, severely burning and disfiguring the plaintiff.

It is unclear why this chemical reaction occurred.[11] Plaintiff alleges that he had been using the Chlorox bottle to water plants and had emptied it before pouring the Liquid Fire into it. Defendant contends, however, that Liquid Fire can be stored safely in an ordinary plastic Clorox container, so long as that container is completely devoid of any water or residue of the Clorox product. (SMF ¶ 8.) To buttress this claim, defendant offered the testimony of James Whitlock, the Vice President of Amazing Products, who conducted an experiment in which he poured Liquid Fire into an empty Clorox container, waited five minutes, and observed "no reaction." (Whitlock Aff. ¶ 5.) When Whitlock placed four ounces of water into an empty Clorox container and then added four ounces of Liquid Fire to the same container, however, he states that the Liquid Fire underwent a chemical reaction with the water and "the bottom of the Clorox container became soft and warm." (*Id.* ¶ 6.) This Court, however, must accept the facts in the light most favorable to the plaintiff and, in doing so, the Court concludes that there was no water residue in the bottle.

Accordingly, the more precise question becomes whether the defendant could have reasonably foreseen that a user might transfer the product into another container. The Court concludes that a jury question is presented as to whether the defendant should have foreseen such a possibility. At the outset, the Court notes that the president of Amazing Product, Jenny Duffy, testified in her deposition that the company assumes that the majority of Liquid Fire purchasers are untrained consumers. (*Id.* at 16, 21–23.) The Court therefore concludes that the

---

10. By way of example, an open and obvious danger might be that inherent in a revolver. *Rhodes v. R.G. Industries*, 173 Ga.App. 51, 53, 325 S.E.2d 465 (1984) (revolver not defective for lack of safety device that would have prevented three-year-old child from discharging it).

11. Defendant has not offered an expert opinion on this matter. Likewise, plaintiff has offered no expert opinion to explain why the melting occurred.

defendant could not assume that the average user would know that transferring the liquid to another container would be dangerous. Moreover, notwithstanding defendant's contention that no chemical reaction would have occurred had the Chlorox bottle been completely emptied of any substance, defendant was nonetheless aware of the dangerous consequences that could result from a transfer.[12] Indeed, Liquid Fire is comprised of 97% sulfuric acid.

The questions then are whether the defendant designed a container that might encourage such a transfer and whether the defendant adequately warned the user of such dangers. As to the first question,[13] the Court concludes that a finder of fact might determine that the design of defendant's container either implicitly encouraged a transfer of the liquid or failed to make such a transfer unnecessary. First, the warning label consisted of three columns of information, with one column in the "center" of the bottle and the other two columns designated as side panels. *See* Court's Exhibit 1, attached to this Order. Some information was in large red print, with other information in a smaller size bold black print, and with a great deal of additional information (approximately 24 lines) in very small black print. The largest red print indicated that the product was dangerous because it was poison and because it could cause severe burns. At the beginning of the side panel labeled "CAUTIONS," the directions exhorted the user to avoid spillage and leakage.[14] Also, on each of the three columns, language in red print warned of the danger of violent eruption.[15] Thus, the average user should be concerned about spilling the product.

Further, although language in the middle of the small, fine print section of the cautionary side column indicated that the user should not transfer the product to another container, quantity usage language in much bolder print on the directions side panel seemed to direct such a transfer. That is, in larger red print, the panel stated "MAXIMUM QUANTITY USAGE," followed a few lines below by bold, black print setting out the maximum amounts to be used for particular fixtures.[16] The maximum quantity usage di-

12. Defendant's vice-president, Mr. Whitlock, testified that notwithstanding his belief that no chemical reaction would have occurred had the Chlorox bottle been completely emptied of any substance, Liquid Fire should never be transferred to another container, for, as Whitlock testified, "[i]f Liquid Fire were stored in a metal container, the acid would react with the metal and could, eventually, eat through the metal container." (*Id.* ¶ 4.) Moreover, if the product were stored in a glass container, the "container could be dropped and the sulfuric acid could burn skin if contacted." (*Id.*)

13. The Court will discuss the adequacy of the warnings and any issue concerning plaintiff's contributory negligence in the next section, *infra* at 1246 *et seq.*

14. The direction said that "To avoid damage against spillage, leakage, or uncapping while transporting, secure in upright position."

15. The "directions" side panel said, "TO AVOID VIOLENT ERUPTION NEVER USE BEFORE, WITH, OR AFTER OTHER DRAIN OPENERS." The center panel stated: "Never pour into drain containing other chemical drain openers and/or hot water as LIQUID FIRE MAY ERUPT VIOLENTLY FROM DRAIN—sending hot acid and drain contents onto persons in area, causing severe burns, personal injury or disfigurement." (All caps denote print that is red and also in all caps on the label; the rest of the quote designates small black print on the label).

16. The directions stated:

Standard drains; Sinks,
| | |
|---|---|
| Showers | 4 ounces |
| Tubs | (1/4 pint) |
| Toilet Bowls | 6–8 ounces (1/2 pint) |
| Septic Tanks | 3–4 gallons |

If any measuring device is used, empty thoroughly; rinse after use and before reusing and/or storing.

rections were followed by language in small black print that stated, "If any measuring device is used, empty thoroughly; rinse after use and before reusing and/or storing."

Thus, the directions clearly envisioned and even directed the user to measure the product before using it. Measuring a product invariably requires one to transfer it to another container. Moreover, other parts of the directions arguably encouraged not only a transfer of the product into a measured container, but also could have encouraged a user to use a container that would give one more control, such as a container with a handle and/or a drip-proof spout. Specifically, in the middle of the small black print part of the directions, the latter provide: "Pour **proper amount** of acid **SLOWLY at arm's length** while at same time with other hand have inverted pail or pan tilted down over same drain opening to protect against possible eruption of acid. **DO NOT LOOK INTO DRAIN.**" (emphasis added; capitalization in original). By insisting that the user pour only a small amount of the acid, that he do so slowly and at arm's length, while the other hand is holding a pail near the drain, and while admonishing the user not to look at the product while he was pouring it, the directions seem to invite use of a container over which one would have maximum control, a container that would not spill on one's hand or arms, and a container into which one had pre-measured the precise quantity of product. Taking all these admonitions together, with the language earlier cited that suggested that a measuring device might need to be used, the directions appear, if not to direct a transfer of the product to another container, to at least suggest that the user should transfer the product.[17]

Thus, the Court concludes that a jury could conclude that the defendant should have foreseen that a user might transfer the liquid into another container, which is exactly what occurred here. Having conceded that a transfer of the product could result in injury to a user, defendant should also have foreseen the consequences of such an action and should have taken measures to forestall this result. Leaving aside the inadequacy of the warnings,[18] some of the measures that defendant could arguably have taken to prevent a need to transfer the product would have been to design a see-through bottle with measurement units or pre-measured "dose" con-

---

**17.** The Court has assumed that no water remained in plaintiff's Chlorox bottle. To the extent that even a few drops remained in the bottle, however, the label does not address that phenomenon, although it discusses the presence of water in several different contexts. The label's admonitions do state that one should "never add water to LIQUID FIRE while in bottle because of a violent reaction." (*Id.*) The label further admonishes users "never [to] pour [Liquid Fire] into [a] drain containing other chemical drain openers and/or hot water as LIQUID FIRE MAY ERUPT VIOLENTLY FROM DRAIN—sending hot acid and drain contents onto persons in area, causing severe burns, personal injury or disfigurement." (*Id.*) (emphasis added) Yet, as part of the instructions for proper use, the bottle instructs a consumer to wait fifteen minutes and then "SLOWLY flush a drain with COLD water." (*Id.*) (emphasis added; capitalization in original). The label also instructs a consumer to rinse the bottle three times with cold water once the bottle is completely empty to avoid burns. (*Id.*) (emphasis added).

If the difference in reaction between Liquid Fire and water is based on the temperature of the water, the label does not explicitly state such, nor does the label indicate whether the water in the drain to be unclogged should be tested for temperature prior to the use of the product. And if Liquid Fire is ingested by a person, the bottle recommends in part that the person consume "large amounts of water," with no indication as to the water's temperature (*Id.*)

**18.** Discussed more at length *infra* at 1246–47 *et seq.*

tainers. Given the requirement that the user pour at arm's length and not look into the area that he was pouring, designing a container with a handle would have given the user more control over the product and may have lessened the need to transfer the product into either a smaller container or a container that possessed a handle and that thereby gave the user more control. Similarly, a drip-free container would also have alleviated some of these concerns. Accordingly, a finder of fact may well conclude that defendant was negligent in not adopting some of these measures.

Defendant has argued that because plaintiff's decision to transfer the Liquid Fire was not motivated by the above concerns, the foreseeability of any of these occurrences becomes insignificant, as defendant's negligence would not have been the proximate cause of the injuries. Specifically, defendant notes that plaintiff's decision to transfer the Liquid Fire into a handled container was not motivated by a concern about spillage, but instead that plaintiff was concerned that he would not be able to properly hold the Liquid Fire container because he had undergone shoulder surgery in the past, which had reduced his ability to grip items tightly. (Def.'s Br. in Supp. of its Mot. for Summ. J. [23] at 14–15). The Court disagrees; it appears that spillage was precisely the plaintiff's concern. The fact that plaintiff had an intensified concern about spillage as a result of his shoulder condition does not negate the fact that any reasonable user should have been concerned about the dangers resulting from spillage.

Defendant also argues that plaintiff could have purchased Liquid Fire in a handled container. (*Id.* at 15.) Plaintiff testified that the dealer where he purchased the product indicated that he had only had a non-handled bottle. Indeed, defendant has acknowledged that it did not manufacture a handle for pint or quart size containers, and plaintiff purchased a pint size container. Finally, it is true that plaintiff did not transfer the product for purposes of measurement. Nevertheless, given all the admonitions discussed above, the defendant could have reasonably foreseen that, for a variety of reasons, a user might wish to transfer the product.

In summary, while a manufacturer is generally *not* liable for injury resulting from an abnormal use of the product, unless the particular unintended use was foreseeably probable, a finder of fact could conclude that defendant could have foreseen that, in the normal use of Liquid Fire as a drain clearer, a user might transfer the product to another container and that the product could react violently when transferred into certain containers or when it comes into contact with water residue. Further, the finder of fact could conclude that the average consumer might not appreciate the above dangers. *Compare Weatherby v. Honda Motor Co., Ltd.*, 195 Ga.App. 169, 173, 176, 393 S.E.2d 64 (1990) (discussing "open and obvious" versus latent danger as applied to the objective appreciation of such danger by an injured child); *Greenway v. Peabody Int'l Corp.*, 163 Ga.App. 698, 704, 294 S.E.2d 541 (not reasonably foreseeable to manufacturer that child killed when trapped between dumpster doors would play inside dumpster).[19] Moreover, the substance of the defendant's warning labels tended to in-

---

19. In the strict liability context, the Georgia Court of Appeals has held that "[w]hen the use to which a product was being put at the time of the injury is not that originally intended by the manufacture[r], the determination of whether strict liability may be asserted as a viable theory of recovery or whether the man-

ufacturer is insulated from liability ... depends, initially, upon the foreseeability that the product would be put to that use." *Ford Motor Company v. Stubblefield*, 171 Ga.App. 331, 319 S.E.2d 470 (1984); see also *Talley v. City Tank Corp.*, 158 Ga.App. 130, 137, 279 S.E.2d 264 (1981).

crease the likelihood of transfer by setting out quantity usage amounts. Accordingly, plaintiffs' allegation that the defendant was negligent in selling the defective Liquid Fire solution, as packaged, should be decided by a trier of fact. See *Taylor v. McClendon,* 205 Ga.App. 390, 422 S.E.2d 440 (1992); *Horney v. Lawrence,* 189 Ga. App. 376, 377, 375 S.E.2d 629 (1988). Defendant's Motion for Summary Judgment [23] is therefore DENIED as to plaintiffs' allegation that the Liquid Fire container was negligent in design.

### 2. *Strict Liability Claim Regarding Design of Container*

As noted *supra* at 1238, like the parties, the Georgia courts tend to treat strict liability and negligence claims interchangeably in the context of alleged design defects. The Georgia Supreme Court in *Banks* recognized that the risk-utility analysis that it promulgated for strict liability claims "bespeaks negligence" and that prior Georgia appellate decisions indicate that the same analysis used in negligence claims will be used in design defect types of strict liability claims. 264 Ga. 732 at 734 & 735 n. 3, 450 S.E.2d 671. Nevertheless, that court refused to concede that the analysis would always overlap between the two types of claims:

> While we recognized that the determination of whether a product was defective (involving the reasonableness of a manufacturer's design decisions), which is a basic inquiry for strict liability purposes, generally will overlap the determination of whether the manufacturer's conduct was reasonable, which is a basic inquiry for negligence purposes, **we cannot agree that the use of negli-**

gence principles to determine whether the design of a product was "defective" necessarily obliterates under every conceivable factual scenario the distinction Georgia law has long recognized between negligence and strict liability theories of liability.

264 Ga. at 735 n. 3, 450 S.E.2d 671 (emphasis added). Notwithstanding its reluctance to absolutely collapse the two concepts, the *Banks* court unfortunately did not offer any helpful examples that would help to illuminate any potential differences. Accordingly, the Court assumes that both approaches would result in identical results in this case.[20]

Moreover, even ignoring the negligence claim, the plaintiff has stated a claim under the risk-utility approach, for the same reasons discussed above in the negligence portion of this discussion. *See* discussion *supra* at 1240–44. Accordingly, the Court **DENIES** defendant's Motion for Summary judgment as to plaintiff's strict liability claim based on a defective design of the container.

### B. *Defendant's Failure to "Bundle" Other Safety Paraphernalia With the Product*

■ Defendant further argues that it should be granted summary judgment as to plaintiffs' claims that the Liquid Fire was defectively packaged because it failed to include additional safety items, such as face shields. Requiring the inclusion of additional safety products with the sale of every container of liquid fire would purportedly impose a burdensome duty on the defendant and would magnify its responsibility in such cases because the defendant

---

**20.** To avoid confusing the jury and sending it two claims, when one claim would do, the Court directs the parties to decide, when they submit the pretrial order whether both claims should be submitted to the jury, and, if so, why. Further, if both strict liability and neg-

ligence claims are to be submitted to the jury as to the same contention and core facts, the parties will need, by the time of trial, to devise instructions that will explain to the jury the difference in the two claims.

would be required to vouch for the reliability and workmanship of products it does not manufacture. (Def.'s Br. in Supp. of its Mot. for Summ. J. [23] at 19.) Defendant cites to *Lotti v. Benjamin Sheridan Corp.*, 1996 U.S. Dist. LEXIS 12383 (N.D.Ga.1996) (Hull, J.), for the proposition that "to expand a manufacturer's liability in this manner is unreasonable and contrary to the laws of this state." (Def.'s Br. in Supp. of its Mot. for Summ. J. [23] at 19.) Accordingly, defendant reasons that as requiring additional safety products to eliminate the risk of injury is "impracticable, onerous, unreasonable and not required by law, the failure to do so cannot be viewed as a marketing/packaging defect." (*Id.*) Plaintiffs failed to respond directly to defendant's contentions in their Brief in Opposition to Defendant's Motion for Summary Judgment. (*See* Pls.' Br. In Opp. To Def.'s Mot. For Summ. J. [35].)

The Court agrees with defendant that liability cannot be based on its failure to provide additional safety equipment with the "Liquid Fire" product. Imposing such a duty on the defendant is contrary to Georgia law in that a manufacturer does not occupy the status of an insurer and is under no duty to make a product that is accident or fool proof. *See Hunt v. Harley–Davidson Motor Co.*, 147 Ga.App. 44, 248 S.E.2d 15 (1978). Georgia law only requires that manufacturers warn of the risks associated with their product, and imposes no duty on manufacturers to specify what kind of safety or protective equipment should be used to guard against those risk. *See Ream Tool Co. v. Newton,* 209 Ga.App. 226, 230, 433 S.E.2d 67 (1993). To be sure, Georgia cases have held that a manufacturer cannot insure the reliability of a product it does not make. *Hall v.*

*Scott USA, Ltd.*, 198 Ga.App. 197, 200, 400 S.E.2d 700 (1990); *Talley v. City Tank Corp.*, 158 Ga.App. 130, 279 S.E.2d 264. 134, 158 Ga.App. 130, 279 S.E.2d 264 (1981). Furthermore, it is not clear how the inclusion of items such as protective glasses, would, in this case, have impacted in any way on Mr. Jones's decision to pour the product into a Clorox container or prevented the injuries he suffered to his leg. Accordingly, defendant's Motion for Summary Judgment as to plaintiffs' claims for strict liability based on design defects in Liquid Fire's packaging is **GRANTED**.

## V. Inadequate Warnings of Danger by Defendant

█ As a result of the above ruling, both the negligence and strict liability claims will be submitted to the jury with regard to the alleged design defect in defendant's container. To clarify the issues to be presented at trial, the Court will also address the question whether defendant is entitled to summary judgment on plaintiff's strict liability and negligence claims arising out of defendant's allegedly inadequate warnings of the danger presented by a transfer of the liquid to another container. There is some potential overlap in the Court's resolution of the "container" claim, as that claim relates to plaintiff's "inadequate warnings" claim, although the Court concludes that a contributory negligence defense is potentially available for the latter, but not the former claim.

█ Plaintiffs claim that defendant provided "inadequate warning of the dangers of use of the product." (Am. Compl. [7] ¶ 8.) The Court has previously discussed the warnings set out on the label. *See* discussion *supra* at 1242–43 and Court's Exhibit 1, attached.[21] The duty to

---

21. In addition to the safety warning/instruction label on the bottle, Liquid Fire is supposedly sold with a hang-tag detailing the recommended safety precautions recommended for a consumer. (J. Duffy Dep. at 35.) Mr. Jones testified, however, that no hang-tag was attached to the product purchased by him. (R.

warn requires a manufacturer to warn of any non-obvious or non-known perils or dangers which the manufacturer has reason to anticipate may result from the use of the product. *See Foskey v. Clark Equipment Co.*, 715 F.Supp. 1088, 1090–91 (M.D.Ga.1989). Defendant responds that to the extent that failure to provide adequate instructions can be considered a design defect or a packaging defect, plaintiffs are prohibited as a matter of law from recovering on this claim because of the uncontroverted evidence that Mr. Jones failed to read the warning label. This failure to read, according to defendant, renders plaintiff contributorily negligent and consequently bars relief. (Def.'s Br. in Supp. of its Mot. for Summ. J. [23] at 19.)

 In a products liability case, *whether or not grounded in a strict liability or negligence theory*, a manufacturer's duty to warn depends on the foreseeability of the use in question, the type of danger involved, and the foreseeability of the user's knowledge of the danger. *See Wilson Foods Corp. v. Turner*, 218 Ga.App. 74, 75, 460 S.E.2d 532 (1995). Where a duty to warn arises, the duty may be breached by (1) failing to adequately communicate the warning to the ultimate user or (2) failing to provide an adequate warning of the product's potential risk. *Id.*, citing *Thornton v. E.I. Du Pont De Nemours & Co.*, 22 F.3d 284 (11th Cir.1994). A failure to read the warning will bar the plaintiff from recovering on the second prong of this test, which is based on the

adequacy of the warning. *Id.* The reason for this result is that if the plaintiff failed to read the warning, the inadequacy of the warning can no longer be the cause of the injury; instead plaintiff's failure to read the warning becomes the cause of the injury. *Henry v. General Motors Corp.*, 60 F.3d 1545, 1548 (11th Cir.1995).

 A plaintiff's failure to read a warning will not, however, bar recovery as to the first prong of the test: namely, where the plaintiff is challenging the *adequacy* of the defendant's efforts to communicate the dangers of the product to the user, not the *substance* of those warnings. *Wilson Foods Corp.*, 218 Ga.App. at 75, 460 S.E.2d at 534 (citing to *Thornton v. E.I. Du Pont De Nemours & Co.*, 22 F.3d 284, 290 (11th Cir.1994) Failure to communicate an adequate warning involves such questions as the location and presentation of the warning.[22] "[W]here plaintiff alleges that a warning is inadequate because it was not effectively communicated—a presentation and location of the warnings case—the plaintiff's failure to read the warning may be [circumstantial] evidence of the inadequacy of the warning." *Wilson Foods*, 218 Ga.App. at 75, 460 S.E.2d at 534 (citing to *Rowson v. Kawasaki Heavy Indus., Ltd.*, 866 F.Supp. 1221, 1238–1239 (N.D.Iowa 1994).)

Despite the fact that plaintiffs fail to specifically articulate this argument, they do refer often to the fact that Mr. Jones attempted to read the label, but failed to read the entire label because the small print size prevented him from doing so.[23]

---

Jones Dep. at 33.) Defendant also produces a safety pamphlet to accompany the product, but it must be specially ordered by the customer. (J. Duffy Dep. at 36.)

**22.** "It is also a jury question whether or not the manufacturer was negligent in failing to place a warning in such position, color and size print or to use symbols which would call the user's attention to the warning or cause

the user to be more likely to read the label and warning than not." Eldridge's Georgia Product Liability, Theories of Negligence, § 2–24, p 49.

**23.** The label supplied by defendant appears to be designed for a gallon sized container. The Court has not examined a label for a pint size container. Presumably, the print would be smaller.

(Pls.' Br. In Opp. To Def.'s Mot. for Summ. J. [35] at 3, 15–16.) Moreover, it appears to this Court that, unlike that part of the directions that directed the user to measure the liquid (thereby implicitly suggesting that the user should transfer the liquid), the part of the cautionary instruction that directed the user not to transfer the product to another container was buried in the middle of a long paragraph, in a very small print size. Indeed, even though looking for this specific language, the undersigned had to read through the label twice to find this particular sentence. *See Stapleton v. Kawasaki Heavy Indust., Ltd.,* 608 F.2d 571, 573 (5th Cir.1979) (where the manufacturer placed a warning concerning the danger of ignition from undetected gas leakage on page 13 of a motorcycle manual, a jury could conclude that the danger posed by this leakage was sufficiently great that the warning should have been presented in a way that was immediately obvious to even a casual reader).

Accordingly, the Court concludes that plaintiff has presented a jury question as to whether the defendant adequately *communicated* the prohibition against transferring the liquid and the Court therefore **DENIES** the defendant's Motion for Summary judgment as to this part of the duty to warn claim.[24]

## VI. Whether Liquid Fire Was So Unreasonably Dangerous That it Should Not have been Marketed in any Form

 Plaintiffs also argue that, no matter how safe defendant made its containers or how adequate and prominent were its warnings, Liquid Fire is nonetheless too dangerous to be distributed to the public. According to plaintiff, this inherent dangerousness constitutes a design defect. Under this theory, defendant's liability would arise merely by the fact that it chose to market this product.

As noted, design defect cases are analyzed under the standards set forth in *Banks v. ICI Americas, Inc.,* 264 Ga. 732, 450 S.E.2d 671 (1994). In *Banks,* the Georgia Supreme Court applied a balancing test, "whereby the risks inherent in a product are weighed against the utility or benefit derived from the product." *Id.* at 734, 450 S.E.2d at 673. The Georgia Supreme Court explained that:

[t]his risk-utility analysis incorporates the concept of 'reasonableness,' i.e., whether the manufacturer acted reasonably in choosing a particular product design, given the probability and seriousness of the risk posed by the design, the usefulness of the product in that condition, and the burden on the manufacturer to take the necessary steps to eliminate the risk. When a jury decides that the risk of harm outweighs the utility of a particular design (that the

24. In theory, the Court could grant a motion for summary judgment as to plaintiff's challenge of the *substance* of the warning. *See Wilson Foods Corp. v. Turner,* 218 Ga.App. 74, 75, 460 S.E.2d 532, 534 (1995). Certainly, the Court will not allow such an allegation to be presented to the jury as a separate negligence claim, as a result of plaintiff's contributory negligence in failing to read all the directions. Nevertheless, as discussed *supra,* it is clear that the substance of the warning will be at issue in the defective container claim. *See* Wilson, *supra* at 76 (plaintiff could still obtain relief based on a claim grounded on the design of the container or the failure to adequately communicate the specific warning, even though the plaintiff could not contest the substance of any warning actually presented because the plaintiff failed to read it). The parties will have to endeavor to draft instructions that capture these metaphysical distinctions.

product is not as safe as it should be), it is saying that in choosing the particular design and cost trade-offs, the manufacturer exposed the consumer to greater risk of danger than he should have. *Id.* at 734, 450 S.E.2d at 673. Both parties argue that *Banks* supports their respective positions as to whether a design defect exists. (Pls.' Br. in Opp. to Def.'s Mot. for Summ. J. [35] at 8–9; Def.'s Br. in Supp. of Mot. for Summ. J. [23] at 9–14.)

Defendant first argues that because plaintiff has failed to show that an alternate "design" for the product existed, plaintiff can prove no design defect in the formulation of the product. Defendant correctly asserts that the evidence indicates that no alternative chemical formulation was feasible. To support this conclusion, defendant notes the concession of plaintiffs' own expert, Professor Wabeke, that an alternative design featuring a lower concentration of sulfuric acid is not a viable option because it would be ineffective in unclogging drains and yet still be hazardous in terms of potential injury. (Wabeke Dep. at 56, 59.) Because a safer solution design is not feasible, defendant argues, plaintiffs cannot establish that Liquid Fire's current design is unreasonable despite its inherent dangerousness.

Plaintiffs do not respond directly to defendant's argument. Nevertheless, the Court has read *Banks* and concludes that its holding does not necessarily require a plaintiff to show that a safer, feasible alternative existed, in order to avoid summary judgment. Admittedly, most of the discussion in that case deals precisely with the availability of alternative designs and the feasibility of those designs, in terms of a cost-benefit analysis. *Banks*, 264 Ga. at 735–36, 450 S.E.2d at 674–75. Nevertheless, the court obliquely hints, in *dictum*, at the possibility that a manufacturer could be liable under a design defect theory even if there were no alternative design possi-

ble. That is, in noting that the crux of the analysis is the reasonableness of the defendant's design decision the court seemed to envision a possibility of liability, no matter the absence of an alternative design:

> Indeed, the reasonableness of choosing from among various alternative product designs and adopting the safest one if it is feasible is considered the "heart" of design defect cases . . . **since it is only at their most extreme that design defect cases reflect the position that a product is simply so dangerous that it should not have been made available at all.** See *O'Brien, supra,* 463 A.2d at 306; Prosser and Keeton, the Law of Torts (5th ed.) ¶ 96, pp. 688–689.

264 Ga. at 736, 450 S.E.2d at 674 (emphasis added).

Thus, the court indicates that there might be an extreme case in which a defendant is liable, even where there was no alternative design, if the jury concluded that the product should simply not be marketed. Clearly, the above statement was gratuitous, as the *Banks* facts did not implicate the highlighted language and, in making the statement, the court appeared merely to be completing the quote from the cited authority. Indeed, *Banks* involved a case in which a child had eaten roach poison that had a candy like shape and color that would appeal to children. Beside the fact that the manufacturer could have arguably adopted a different design for the packaging of the product, the evidence also showed that the manufacturer could have added ingredients which would cause humans, but not rats, to reject the poison as bitter tasting or to vomit it after ingesting it. *Banks v. ICI Americas, Inc.,* 266 Ga. 607, 608, 469 S.E.2d 171, 173 (1996), citing *ICI Americas, Inc. v. Banks,* 211 Ga.App. 523, 440 S.E.2d 38 (1993).

Thus, *Banks* was a case in which there were clearly alternative design options and

therefore the highlighted language is *dictum*. This Court would be more comfortable in concluding that the above statement in *Banks* was merely a stray comment made in the context of quoting another source, however, were it not for the dissent of Justice Fletcher, who states that "by suggesting that a safer feasible alternative is a mere factor to be considered, rather than an essential element, the majority endorses a standard that is inconsistent with the reality that although '[m]any products can not be made completely safe for use and some can not be made safe at all...such products may be useful and desirable."' *See Banks,* 264 Ga. at 738, 450 S.E.2d at 676 (Fletcher, J. dissenting).

Nevertheless, given the significant ramifications that the majority's *dictum* poses to long-standing tort law, this Court is uncertain what effect to give the *dictum*. The ramification of the holding, as interpreted by plaintiff, would mean that a jury could effectively decide to prohibit a potentially dangerous product for which all warnings had been given and for which the safest design possible had been chosen, even if the consumer explicitly accepted the risk and wanted to purchase the product. Traditionally, legislatures and regulatory bodies, not juries, make policy decisions concerning whether a given product is too inherently dangerous to be marketed in any form.[25]

Further, even endeavoring to apply the language, this Court is uncertain how to gauge whether a particular case is or is not an "extreme" case, under the Georgia Supreme Court's definition.[26] Even attempting to intuit the meaning of the term "extreme case," however, this Court concludes that the facts in this case do not trigger the requisite "extremeness" alluded to by the Georgia court. Central to this Court's conclusion is the evidence that the Consumer Product Safety Commission ("CPSC") conducted an extensive evaluation of sulfuric acid drain clearers and unanimously concluded that products like "Liquid Fire" were no more dangerous than any other type of drain clearer on the market. (SMF ¶ 9.) (*See* CPSC Report attached as Ex. C to Def.'s Br. In Supp. Of Mot. For Summ. J. [23].) Specifically, the CPSC found that the number of incidents involving sulfuric acid drain clearers were not proportionately greater than the number of incidents involving other non-sulfuric drain clearers. (*Id.*) To state it slightly differently, the CPSC asserts that incidence of sulfuric-acid drain clearer injuries appears proportional to the market share of sulfuric-acid drain clearers. The CPSC also found that the "severity of injuries from the other drain clearers equals or surpasses those of sulfuric acid." (*Id.*)

The plaintiffs dispute the soundness of the CPSC's decision,[27] but the fact remains

---

**25.** In support of his argument that defendant's product is too dangerous to be marketed in any form, plaintiff notes that sulfuric-acid based drain clearers are banned in Tennessee as a hazardous substance too dangerous for sale to the public. (Pls.' Br. in Opp. to Def.'s Mot. for Summ. J. [35] at 11.) The flip side of this argument, however, is the fact that such clearers have not been banned by the Georgia legislature. Plaintiff's argument reinforces the traditional notion that perhaps the best place for a determination whether a product should be banned is a legislative or regulatory body, not a court.

**26.** The plaintiff has not cited any precedent, nor is this Court aware of any decision, in which the Georgia Supreme Court has actually allowed a jury to find a manufacturer liable simply on the ground that a product was inherently dangerous, without a showing of the existence of an alternative design, a hidden defect, a failure to warn, or the like.

**27.** The plaintiffs point to the opinion of Professor Wabeke, who has researched the reporting of drain-clearer related injuries in emergency rooms. (*See* Wabeke Letter dated March 5, 2001 attached as Ex. E. to Pls.' Resp. to Def.'s Mot. for Summ. J. [35] (herein-

that the finding of a national safety regulatory agency that a given product is not too hazardous for public use suggests to this court that, absent other circumstances, the product would not trigger the "extreme case" characterization that the Georgia Supreme Court articulated, whatever definition it may someday apply to that label.[28] As to any other circumstances that might trigger some awareness on the part of the defendant that, contrary to the finding of the CPSC, its product was too dangerous to market, plaintiff offers no probative evidence.[29]

Finally, in addition to the merits of the matter, the Court concludes that summary judgment on this claim is also warranted on practical grounds. This Court has determined that plaintiff shall reach a jury as to his design defect claim concerning the container and as to his claim that the defendant did not adequately communicate the necessary warning. If a jury decides against plaintiff on both of those claims, as a logical matter, it would necessarily decide against plaintiff on his theory of inherent dangerousness, with the latter claim being a much more up-hill challenge for the plaintiff than the other two claims. Conversely, if the jury rules for plaintiff on either of these two claims, there will have been no need to present this very problematic claim concerning the inherent dangerousness of the product. Besides potentially endangering the validity of any verdict that the plaintiff might receive on these two claims, presentation of a theory of inherent dangerousness would pose significant challenges in the crafting of an instruction to make intelligible a concept that the Georgia Supreme Court has not fleshed out. Such an instruction would undoubtedly confuse the jury.

## VII. Gross Negligence Claim

■ Count Three of plaintiffs' Amended Complaint [7] sets forth a gross negligence claim against defendant, contending that the acts and omission of defendant described in the strict liability and negligence sections showed more than momentary thoughtlessness, inadvertence, or error of judgment. Rather, plaintiffs claim that defendant showed actual conscious indifference to the rights, welfare, and safety of plaintiffs and others using its product. Failure to exercise slight care constitutes "gross negligence." *Werbell v. Walters*, 93 Ga.App. 378, 91 S.E.2d 841 (1956). To buttress this claim, plaintiffs note that defendant has had between twenty-five and fifty lawsuits related to injury through use of its product since 1988, but has neglected to change its product design in any way. (Pls.' Br. in Resp. to Def.'s Mot. for Summ.

after "Wabeke Letter").) Professor Wabeke claims that because of confusion over whether a product is lye or sulfuric acid, the number and severity of sulfuric acid based drain clearers are under-reported in emergency-room cases. (Wabeke Letter.) Professor Wabeke may be right, but he offers little concrete support for his assertion that the CPSC reviewed faulty data.

28. By this holding, the Court does not intend to endorse the conclusion of the CPSC. Professor Wabeke appears to have spent many years researching this issue and indicates an apparently sincere conviction that sulfuric-acid based drain cleaners are too dangerous to be marketed. His recommendation may ultimately carry the day, as sulfuric-acid based cleaners do appear to pose serious hazards.

29. Plaintiff proffers the testimony of the president of Amazing Product that, since 1988, between twenty five and fifty lawsuits have been brought against Amazing Products that relate to injury that occurred from the use of this product. (J. Duffy Dep. at 66–67.) Yet, plaintiff never elaborates on the circumstances that underlay these lawsuits and therefore this Court can draw no firm conclusions concerning their significance to the present litigation.

J. [35] at 19–20.) Defendant responds that since it alleges that there is no evidence of negligence in this case, plaintiffs' claim for gross negligence must likewise be dismissed. (Def.'s. Br. in Supp. of its Mot. for Summ. J. [23] at 24.)

As the Court has determined that two negligence claims—negligence relating to the design of the container and the failure to adequately communicate the necessary warning—survive defendant's motion for summary judgment, the Court will likewise allow the claims of gross negligence with regard to these matters to survive, as well, for the moment. Prior to trial, however, plaintiff will need to explain how a gross negligence claim adds anything to his case. If the claim is nothing more than an additional way of casting plaintiff's existing negligence claims, the Court will be reluctant to confuse the jury by submitting these claims to them.

Accordingly, the Court **GRANTS, in part**, and DENIES, in part, summary judgment as to all gross negligence claims, consistent with the foregoing language.

### VIII. Plaintiff's Motion for Reconsideration

■■■ Plaintiffs have moved this Court to reconsider its Order dated November 6, 2001[37] where the Court found no basis for plaintiffs' Emergency Motion for Rule 37(b) Sanctions. In their Motion for Reconsideration [34–4], plaintiffs fail to present to the Court any new arguments in support of its previous Emergency Motion. Because this Motion for Reconsideration, like the Emergency Motion for Sanctions before it, is without basis and further wastes both this Court's time and the time of the defense counsel, the Court **DENIES** plaintiffs' Motion for Reconsideration [37]. The Court extends the November 6, 2001 Order to cover all defense attorney's fees and expenses related to the cost of reviewing and responding to plaintiffs' Motion for Reconsideration.

### CONCLUSION

For the foregoing reasons, the Court finds that defendant's Motion for Summary Judgment [23–1] should be **GRANTED in part** and **DENIED in part** and plaintiffs' Motion for Reconsideration of the Court's Order dated October 6, 2001 [34–4] should be **DENIED.**

TO OPEN SET BOTTLE ON FLAT SURFACE
DO NOT SQUEEZE ON SIDES

## DIRECTIONS
### READ BEFORE USING

TO AVOID VIOLENT ERUPTION NEVER USE BEFORE, WITH, OR AFTER OTHER DRAIN OPENERS.

Protect eyes, face by using full face shield. Wear rubber gloves and protect other parts of body and clothes. To open place on flat surface in upright position. Never squeeze plastic bottle. Remove cap by following directions on cap and never use any tool to remove cap. Have total room ventilation and never breathe vapors. Use in drain pipes installed by licensed plumbers and approved by state codes. Examine drain pipes before using for possible rust out. Place plastic pail under sink pipes. Remove standing water. Pour proper amount of acid SLOWLY at arm's length while at same time with other hand have inverted pail or pan tilted down over same drain opening to protect against possible eruption of acid. DO NOT LOOK INTO DRAIN. Allow to work for 15 minutes. SLOWLY flush with COLD water and stop if it backs up to drain opening. Never use in sink disposal, rusted pipes, and never use in hand plunger with LIQUID FIRE. For toilet bowls lower water and never overuse as heat can crack china bowl. Flush with pail of cold water to avoid overflow; never use tank water for flushing. No plungers. Never allow acid to contact any surfaces including metal, wood, enamel, or acrylic. Do not use with old fixtures as airborne vapors and lack of porcelain may cause discoloration. After using, replace cap tightly.

MAXIMUM QUANTITY USAGE

TO AVOID VIOLENT ERUPTION NEVER USE BEFORE, WITH, OR AFTER OTHER DRAIN OPENERS.

| | |
|---|---|
| Standard Drains: Sinks, Showers | 4 ounces |
| Tubs | (¼ pint) |
| Toilet Bowls | 6-8 ounces (½ pint) |
| Septic Tanks | 3-4 gallons |

If any measuring device is used, empty thoroughly; rinse after use and before reusing and/or storing.

**Amazing!Products, Inc.**
P.O. Box 14226 • Louisville, Kentucky 40214
3/99 1 U.S. QUART (946.4 ml)

**Amazing!**
**LIQUID FIRE**

### READ LABEL
BEFORE PURCHASING, OPENING OR USING

## DRAIN LINE OPENER
### CAUTIONS

Severe personal injury may result from improper use! Follow directions and cautions — Read Entire Label. Never use before, with, or after other chemical drain openers or any other chemicals. Avoid contact with eyes, skin, clothes. Never pour into drain containing other chemical drain openers and/or hot water as LIQUID FIRE MAY ERUPT VIOLENTLY FROM DRAIN — sending hot acid and drain contents onto persons in area, causing severe burns, personal injury or disfigurement.

## ☠ DANGER - POISON ☠
### CAUSES SEVERE BURNS
### CORROSIVE TO EYES AND SKIN
### HARMFUL OR FATAL IF SWALLOWED

Read Carefully
Other Cautions
on Side Panels

0 95442 12000 3

To avoid damage against spillage, leakage or uncapping while transporting, secure in upright position.

## CAUTIONS
### READ BEFORE USING

Contains concentrated sulfuric acid.

May cause eruption of hot acid when poured into drain. Protect eyes, face and other portions of body. Do not get on skin or clothing. Corrosive to eyes and skin. Causes severe burns. Read directions for protective measures.

Never purchase or store without child resistant cap. Never transfer to another container. Never add water to LIQUID FIRE while in bottle because of violent reaction. When bottle is completely empty rinse 3 times with cold water before discarding to prevent burns.

Never attempt to disassemble plumbing or remove clean out plug(s) from lines containing LIQUID FIRE. To neutralize acid flush with water.

### FIRST-AID

External: Immediately flush with water for 15 minutes. Call physician immediately and get prompt medical attention.

Internal: Do not induce vomiting. Immediately drink large quantities of water or milk. Follow with milk of magnesia, beaten eggs or vegetable oil. Call physician immediately and get prompt medical attention.

Eyes: Immediately flush with large amount of water for 15 minutes and get prompt medical attention.

Store Bottle in Cool, Protected Place, OUT OF THE REACH OF CHILDREN.

## KEEP OUT OF THE REACH OF CHILDREN